1  **BRIDGET KENNEDY**
   California State Bar No. 253416
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California  92101-5030
   Telephone:  (619) 234-8467, ext. 3740
4  Fax: (619) 687-2666
   Bridget_Kennedy@fd.org
5

6  Attorneys for Mr. Garcia

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                 (**HONORABLE DANA M. SABRAW**)

11  UNITED STATES OF AMERICA,          )   CASE NO.  08CR0726-DMS
                                       )
12            Plaintiff,               )
                                       )   STATEMENT OF FACTS AND
13  v.                                 )   MEMORANDUM OF POINTS AND
                                       )   AUTHORITIES IN SUPPORT OF
14  JESUS DAVID GARCIA,                )   DEFENDANT'S MOTIONS.
                                       )
15            Defendant.               )
    _____)
16

17                              **I.**

18                    **STATEMENT OF FACTS**[1]

19          On February 28, 2008, Mr. Garcia entered the United States at the Calexico, California

20  West Port of Entry.  He was driving a 1995 Mitsubishi passenger vehicle.  Mr. Garcia gave a

21  negative customs declaration to Customs and Border Protection Officer J. Rodriguez.  Officer

22  Rodriguez referred Mr. Garcia to secondary.  At secondary a Narcotic Detector Dog alerted to the

23  driver's side rear quarter panel of the vehicle.  A total of 30 packages, weighing 42.22 kilograms, of

24  marijuana were found in the vehicle.

25  //

26  //

27  //

28  _____

    [1]The statement of facts is based on the government's complaint and probable cause statement.
    Mr. Garcia does not admit their accuracy and reserves the right to challenge them at a later time.

1

## II.
.

2

3

4

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING Mr. CAMACHO-MELENDEZ OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

5

**A.      Introduction.**

6

The indictment in the instant case was returned by the January 2007 grand jury.  That

7

grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on

8

January 11, 2007.  See Reporter's Transcript of the Proceedings, dated January 11, 2007, a copy of

9

which is attached hereto as Exhibit A.  Judge Burns's instructions to the impaneled grand jury

10

deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury

11

instruction previously given in this district in several ways.[2]  These instructions compounded Judge

12

Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the

13

grand jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript

14

of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[3]

15

16

17

**1.     Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

18

After repeatedly emphasizing to the grand jurors that probable cause determination was

19

their sole responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they

20

were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is,

21

whether or not there should be a federal law or should not be a federal law designating certain

22

23

24

25

[2]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

26

27

28

[3]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury.  Mr. Garcia requests that the video presentation be produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[4]  See also id. at 20 ("You're all about probable cause.").

1    activity [as] criminal is not up to you." <u>See</u> <u>id.</u> at 8.  The instructions go beyond that, however, and

2    tell the grand jurors that, should "you disagree with that judgment made by Congress, then your

3    option is not to say 'well, I'm going to vote against indicting even though I think that the evidence

4    is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" <u>See</u>

5    <u>id.</u> at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because the grand

6    jurors disagree with a proposed prosecution.

7         Immediately before limiting the grand jurors' powers in the way just described, Judge

8    Burns referred to an instance in the grand juror selection process in which he excused three potential

9    jurors.  <u>See</u> <u>id.</u> at 8.

10            I've gone over this with a couple of people.  You understood from
             the questions and answers that a couple of people were excused,
11           I think three in this case, because they could not adhere to the
             principle that I'm about to tell you.
12

13   <u>Id.</u>  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

14   disagreement with Congress.  <u>See</u> <u>id.</u> at 8-9.  Thus, Judge Burns not only instructed the grand jurors

15   on his view of their discretion; he enforced that view on pain of being excused from service as a

16   grand juror.

17        Examination of the voir dire transcript, which contains additional instructions and

18   commentary in the form of the give and take between Judge Burns and various prospective grand

19   jurors, reveals Judge Burns's emphasis on the singular duty to determine whether or not probable

20   cause exists, and his statement that grand jurors cannot judge the wisdom of the criminal laws

21   enacted by Congress merely compounded an erroneous series of instructions already given to the

22   grand jury venire.  In one of his earliest substantive remarks, Judge Burns makes clear that the grand

23   jury's sole function is probable cause determination.

24            [T]he grand jury is determining really two factors: "do we have
             a reasonable belief that a crime was committed?  And second, do
25           we have a reasonable belief that the person that they propose that
             we indict committed the crime?"
26
             If the answer is "yes" to both of those, then the case should move
27           forward.  If the answer to either of the questions is "no," then the
             grand jury should not hesitate and not indict.
28

1   See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear

2   that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional

3   when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a

4   crime was committed" or if it has no "reasonable belief that the person that they propose that we

5   indict committed the crime."

6           Equally revealing are Judge Burns's interactions with two potential grand jurors who

7   indicated that, in some unknown set of circumstances, they might decline to indict even where there

8   was probable cause.  Because of the redactions of the grand jurors' names, Mr. Garcia will refer to

9   them by occupation.  One is a retired clinical social worker (hereinafter CSW), and the other is a real

10  estate agent (hereinafter REA).  The CSW indicated a view that no drugs should be considered

11  illegal and that some drug prosecutions were not an effective use of resources.  See id. at 16.  The

12  CSW was also troubled by certain unspecified immigration cases.  See id.

13          Judge Burns made no effort to determine what sorts of drug and immigration cases

14  troubled the CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases

15  actually filed in this district, such as drug smuggling cases and cases involving reentry after

16  deportation and alien smuggling.  Rather, he provided instructions suggesting that, in any event, any

17  scruples CSW may have possessed were simply not capable of expression in the context of grand

18  jury service.

19              Now, the question is can you fairly evaluate [drug cases and
                immigration cases]?  Just as the defendant is ultimately entitled
20              to a fair trial and the person that's accused is entitled to a fair
                appraisal of the evidence of the case that's in front of you, so, too,
21              is the United States entitled to a fair judgment. If there's probable
                cause, then the case should go forward. *I wouldn't want you to*
22              *say*, "well, yeah, there's probable cause, but I still don't like what
                our government is doing. I disagree with these laws, so I'm not
23              going to vote for it to go forward." If that is your frame of mind,
                the probably you shouldn't serve. Only you can tell me that.
24

25  See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let

26  the grand juror know that he would not want him or her to decline to indict in an individual case

27  where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there

28  was probable cause.  See id.  Such a case "should go forward."  See id.  Given that blanket

    proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the

1    CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence

2    warranted it."  See id.  Again, Judge Burns's question provided no context; he inquired regarding

3    "a case," a term presumably just as applicable to possession of a small amount of medical marijuana

4    as kilogram quantities of methamphetamine for distribution.  Any grand juror listening to this

5    exchange could only conclude that there was *no* case in which Judge Burns would permit them to

6    vote "no bill" in the face of a showing probable cause.

7            Just in case there may have been a grand juror that did not understand his or her

8    inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his

9    exchange with REA.  REA first advised Judge Burns of a concern regarding the "disparity between

10   state and federal law" regarding "medical marijuana."  See id. at 24.  Judge Burns first sought to

11   address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are

12   simply forbidden from taking penalty considerations into account.

13               Well, those things -- the consequences of your determination
                 shouldn't concern you in the sense that penalties or punishment,
14               things like that -- we tell trial jurors, of course, that they cannot
                 consider the punishment or the consequence that Congress has set
15               for these things.  We'd ask you to also abide by that.  We want
                 you to make a business-like decision of whether there was a
16               probable cause. . . .

17   Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge

18   Burns went on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at

19   25.

20           In response to further questioning, REA disclosed REA's belief "that drugs should be

21   legal."  See id.  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an

22   instruction that a grand juror is obligated to vote to indict if there is probable cause.

23               I can tell you sometimes I don't agree with some of the legal
                 decisions that are indicated that I have to make.   But my
24               alternative is to vote for someone different, vote for someone that
                 supports the policies I support and get the law changed.  It's not
25               for me to say, "well, I don't like it.  So I'm not going to follow it
                 here."
26
                 You'd have a similar obligation as a grand juror even though you
27               might have to grit your teeth on some cases.  Philosophically, if
                 you were a member of congress, you'd vote against, for example,
28               criminalizing marijuana.  I don't know if that's it, but you'd vote
                 against criminalizing some drugs.

1
2
3

> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

4   Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test,

5   which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

6         Having set forth the duty to indict, and being advised that REA was "uncomfortable"

7   with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation

8   from the obligation to indict in every case in which there was probable cause.

9
10
11
12

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

13   Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely

14   on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case,"

15   see id., as it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that

16   REA would vote to indict in some (perhaps many or even nearly all) cases in which there was

17   probable cause. Again, Judge Burns made no effort to explore REA's views; he did not ascertain

18   what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what

19   type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the

20   "obligation" is "to vote in favor of the case going forward."[5]  See id. at 27. That is why even the

21   "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

22   //

23

---

24   [5] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate

25   judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence. See Ex. A at 6. This instruction created an imprimatur of finding

26   probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all. The Grand Jury was informed that it

27   merely was redundant to the magistrate court "in most circumstances." See id. This instruction

28   made the grand jury more inclined to indict irrespective of the evidence presented.

**2. The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.[6]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

_____

[6] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1    The antecedent to this instruction is also found in the voir dire.  After advising the

2  grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex.

3  B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-

4  the-ball.  If there's something adverse or that cuts against the charge, you'll be informed of that.

5  They have a duty to do that." See id.  Thus, Judge Burns unequivocally advised the grand jurors that

6  the government would present any evidence that was "adverse" or "that cuts against the charge."

7  See id.

8  **B.**       **Navarro-Vargas Establishes Limits on the Ability of Judges to**
           **Constrain the Powers of the Grand Jury, Which Judge Burns Far**
9           **Exceeded in His Instructions as a Whole During Impanelment.**

10    The Ninth Circuit has, over vigorous dissents, rejected challenges to various

11  instructions given to grand jurors in the Southern District of California.  See Navarro-Vargas II, 408

12  F.3d 1184.  While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the

13  course of adopting a highly formalistic approach[7] to the problems posed by the instructions, endorsed

14  many of the substantive arguments raised by the defendants in those cases.  The district court's

15  instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.

16  Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond

17  those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential

18  grand jury, focused solely upon probable cause determinations and utterly unable to exercise any

19  quasi-prosecutorial discretion.  That is not the institution the Framers envisioned. See United States

20  v. Williams, 504 U.S. 36, 49 (1992).

21    For instance, with respect to the grand jury's relationship with the prosecution, the

22  Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the

23  public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up,

24  performs much the same function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting

25

26    [7]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
27  majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
   imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
28  constitutional independence.").

1   Butz v. Economou, 438 U.S. 478, 510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d

2   896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion

3   in this regard "is most accurately described as prosecutorial.").  See also Navarro-Vargas II, 408 F.3d

4   at 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any

5   indictment or presentment returned by a grand jury, id., but also that "the grand jury has no

6   obligation to prepare a presentment or to return an indictment drafted by the prosecutor."  Id.  See

7   Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal

8   Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably

9   . . . the most important attribute of grand jury review from the perspective of those who insisted that

10  a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

11  Procedure § 15.2(g) (2d ed. 1999)).

12          Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the

13  attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

14                  The grand jury thus determines not only whether probable cause
                    exists, but also whether to "charge a greater offense or a lesser
15                  offense; numerous counts or a single count; and perhaps most
                    significant of all, a capital offense or a non-capital offense -- all
16                  on the basis of the same facts.  And, significantly, the grand jury
                    may refuse to return an indictment even "'where a conviction can
17                  be obtained.'"

18  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's

19  description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that

20  the grand jury "controls not only the initial decision to indict, but also significant questions such as

21  how many counts to charge and whether to charge a greater or lesser offense, including the important

22  decision whether to charge a capital crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge

23  Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez:  "the

24  majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor

25  has established probable cause that this individual has committed a crime."   See id. at 1214

26  (Hawkins, J. dissenting).   Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting);

27  United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

28  dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth

1    Circuit.  But not in Judge Burns's instructions.

2    **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury**
     **Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

3

4              The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room

5    for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis

6    in its previous decision in <u>Marcucci</u>.  <u>Marcucci</u> reasoned that the instructions do not mandate that

7    grand jurors indict upon every finding of probable cause because the term "should" may mean "what

8    is probable or expected."  299 F.3d at 1164 (citation omitted).  That reading of the term "should"

9    makes no sense in context, as Judge Hawkins ably pointed out.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at

10   1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be

11   understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe

12   the grand jury's constitutional independence.").  <u>See also</u> <u>id.</u> ("The 'word' should is used to express

13   a duty [or] obligation.") (quoting <u>The Oxford American Diction and Language Guide</u> 1579 (1999)

14   (brackets in original)).

15              The debate about what the word "should" means is irrelevant here; the instructions here

16   make no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors

17   simply may not choose not to indict in the event of what appears to them to be an unfair application

18   of the law: should "you disagree with that judgment made by Congress, then your option is not to

19   say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...."

20   <u>See</u> Ex. A at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because

21   they disagree with a proposed prosecution. No grand juror would read this language as instructing,

22   or even allowing, him or her to assess "the need to indict."  <u>Vasquez</u>, 474 U.S. at 264.

23              While Judge Burns used the word "should" instead of "shall" during voir dire with

24   respect to whether an indictment was required if probable cause existed, <u>see</u> Ex. B at 4, 8, n context,

25   it is clear that he could only mean "should" in the obligatory sense.  For example, when addressing

26   a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable

27   cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not

28   indict."  <u>See</u> <u>id.</u> at 8.  At least in context, it would strain credulity to suggest that Judge Burns was

1  using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no]

2  probable cause." See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was not.

3          The full passage cited above effectively eliminates any possibility that Judge Burns

4  intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have
> a reasonable belief that a crime was committed?  And second, do
> we have a reasonable belief that the person that they propose that
> we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move
> forward.  If the answer to either of the questions is "no," then the
> grand jury should not hesitate and not indict.

10  See Ex. B at 8.  Of the two sentences containing the word 'should," the latter of the two essentially

11  states that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have

12  intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See

13  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the

14  grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S.

15  338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination

16  whether there is probable cause and the protection of citizens against unfounded criminal

17  prosecutions.") (citation omitted).

18          By the same token, if Judge Burns said that "the case should move forward" if there

19  is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable

20  cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would

21  have to have intended two different meanings of the word "should" in the space of two consecutive

22  sentences.  That could not have been his intent.  But even if it were, no grand jury could ever have

23  had that understanding.[8]  Jurors are not presumed to be capable of sorting through internally

24  contradictory instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995)

25

26          [8]  This argument does not turn on Mr. Garcia's view that the Navarro-Vargas/Marcucci

27  reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the
context in which the word is employed by Judge Burns in his unique instructions, context which

28  eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1   ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct

2   one") (citation, internal quotations and brackets omitted).

3          Lest there be any room for ambiguity, on no less than four occasions, Judge Burns

4   made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

5          (1)  The first occasion occurred in the following exchange when Judge Burns

6   conducted voir dire and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go
> forward.  I wouldn't want you to say, "Well, yeah, there's
> probable cause.  But I still don't like what the government is
> doing.  I disagree with these laws, so I'm not going to vote for it
> to go forward."  If that's your frame of mind, then probably you
> shouldn't serve.  Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge
> even if you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

14  See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a

15  prospective juror.  Even if the prospective juror did not like what the government was doing in a

16  particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote

17  that might prevent that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction

18  for the possibility of independent judgment was dismissal, a result that provided full deterrence of

19  that juror's discretion and secondary deterrence as to the exercise of discretion by any other

20  prospective grand juror.

21         (2)  In an even more explicit example of what "should" meant, Judge Burns makes

22  clear that it there is an unbending obligation to indict if there is probable cause.  Grand jurors have

23  no other prerogative.

Court      . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."
           You'd have a similar *obligation* as a grand juror even though you
           might have to grit your teeth on some cases.  Philosophically, if
           you were a member of Congress, you'd vote against, for example,
           criminalizing marijuana.  I don't know if that's it, but you'd vote
           against criminalizing some drugs.

           That's not what your *prerogative* is here.  Your prerogative
           instead is act like a judge and to say, "All right.  This is what I've

1
2
3

> got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

4   <u>Id.</u> at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and

5   prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases

6   even though you were convinced there was probable cause they committed a drug offense?" <u>Id.</u> at

7   27.  The potential juror responded: "It would depend on the case." <u>Id.</u>  Nevertheless, that juror was

8   excused.  <u>Id.</u> at 28.  Again, in this context, and contrary to the situation in <u>Navarro-Vargas</u>, "should"

9   means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if

10  there is probable cause.

11        Moreover, as this example demonstrates, the issue is not limited to whether the grand

12  jury believes a particular law to be "unwise."  This juror said that any decision to indict would not

13  depend on the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's

14  point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit

15  for service.  It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he

16  was prepared to indict under some factual scenarios, perhaps many.  But Judge Burns did not pursue

17  the question of what factual scenarios troubled the prospective jurors, because his message is that

18  there is no discretion not to indict.

19        (3)  As if the preceding examples were not enough, Judge Burns continued to pound

20  the point home that "should" meant "shall" when he told another grand juror during voir dire:

21  "[W]hat I have to insist on is that you follow the law that's given to us by the United States

22  Congress.  We enforce the federal laws here."  <u>See id.</u> at 61.

23        (4)  And then again, after swearing in all the grand jurors who had already agreed to

24  indict in every case where there was probable cause, Judge Burns reiterated that "should" means

25  "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against

26  indicting even though I think that the evidence is sufficient' . . . . Instead your *obligation* is . . . not

27  to bring your personal definition of what the law ought to be and try to impose that through applying

28  it in a grand jury setting."  <u>See</u> Ex. A at 9.

1    Moreover, Judge Burns advised the grand jurors that they were forbidden from

2   considering the penalties to which indicted persons may be subject.

3          Prospective Juror (REA): ... And as far as being fair, it kind of
           depends on what the case is about because there is a disparity
4          between state and federal law.
           The Court: In what regard?
5          Prospective Juror: Specifically, medical marijuana.
           The Court:  Well, those things -- the consequences of your
6          determination shouldn't concern you in the sense that penalties or
           punishment, things like that -- *we tell trial jurors, of course, that*
7          *they cannot consider the punishment or the consequence that*
           *Congress has set for these things. We'd ask you to also abide by*
8          *that.*  We want you to make a business-like decision of whether
           there was a probable cause. ...

9

10   See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable

11   cause" would obviously leave no role for the consideration of penalty information.

12          The Ninth Circuit previously rejected a claim based upon the proscription against

13   consideration of penalty information based upon the same unlikely reading of the word "should"

14   employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).

15   Cortez-Rivera is inapposite for two reasons.  First, Judge Burns did not use the term "should" in the

16   passage quoted above.  Second, that context, as well as his consistent use of a mandatory meaning

17   in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.

18   The instructions again violate Vasquez, which plainly authorized consideration of penalty

19   information.  See 474 U.S. at 263.

20          Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors

21   time and time again that they had a duty, an obligation, and a singular prerogative to indict each and

22   every case where there was probable cause.  These instructions go far beyond the holding of

23   Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez.

24   Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire,

25   could possibly believe what the Supreme Court held in Vasquez:

26          The grand jury does not determine only that probable cause exists
           to believe that a defendant committed a crime, or that it does not.
27          In the hands of the grand jury lies the power to charge a greater
           offense or a lesser offense; numerous counts or a single count;
28          and perhaps most significant of all, a capital offense or a non-

1
2

> capital offense – all on the basis of the same facts.  Moreover,
> "[t]he grand jury is not bound to indict in every case where a
> conviction can be obtained."

3  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly,

4  J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls

5  not only the initial decision to indict, but also significant decisions such as how many counts to

6  charge and whether to charge a greater or lesser offense, including the important decision whether

7  to charge a capital crime.").  Nor would the January 2007 grand jury ever believe that it was

8  empowered to assess the "the need to indict." See id. at 264.  Judge Burns's grand jury is not

9  Vasquez's grand jury.  The instructions therefore represent structural constitutional error "that

10 interferes with the grand jury's independence and the integrity of the grand jury proceeding." See

11 United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must therefore be

12 dismissed. Id.

13      The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure

14 for the instructions' excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's

15 discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the

16 unreviewability of its decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that

17 a judge's instructions may have on a grand jury because "it is the *structure* of the grand jury process

18 and its *function* that make it independent."  Id. at 1202 (emphases in the original).

19      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes

20 that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and

21 unreviewability of many of its decisions -- sufficiently protects that power."  See id. at 1214

22 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that

23 it lacks power to do anything beyond making a probable cause determination ... unconstitutionally

24 undermines the very structural protections that the majority believes save[] the instruction."  Id.

25 After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'"

26 Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that "invariable assumption" were

27 to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez.  Indeed,

28 "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions

1    because nothing will happen if they disobey them." Id.

2            In setting forth Judge Hawkins' views, Ms. Sanchez understands that this Court may

3    not adopt them solely because the reasoning that supports them is so much more persuasive than the

4    majority's sophistry. Rather, she sets them forth to urge the Court *not to extend* what is already

5    untenable reasoning.

6            Here, again, the question is not an obscure interpretation of the word "should",

7    especially in light of the instructions and commentary by Judge Burns during voir dire discussed

8    above - unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed

9    to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the

10   recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-

11   Vargas II is distinguishable on that basis, but not only that.

12           Judge Burns did not limit himself to denying the grand jurors the power that Vasquez

13   plainly states they enjoy. He also excused prospective grand jurors who might have exercised that

14   Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere

15   to [that] principle...." See Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy

16   of its deliberations cannot embolden grand jurors who are no longer there, likely because they

17   expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408

18   F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves

19   ... to protect the accused from the other branches of government by acting as the 'conscience of the

20   community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The

21   federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand

22   jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both

23   fashioned his own rules and enforced them.

24   **D.       The Instructions Conflict with Williams' Holding That There Is No
             Duty to Present Exculpatory Evidence to the Grand Jury.**

25

26           In Williams, the defendant, although conceding that it was not required by the Fifth

27   Amendment, argued that the federal courts should exercise their supervisory power to order

28   prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure

1    required by Fifth Amendment common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a

2    general matter at least, no such 'supervisory' judicial authority exists."  <u>See id.</u> at 47.  Indeed,

3    although the supervisory power may provide the authority "to dismiss an indictment because of

4    misconduct before the grand jury, at least where that misconduct amounts to a violation of one of

5    those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to

6    ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it does not serve as

7    "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  <u>Id.</u> at 47

8    (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

9    initiative, rules of grand jury procedure."  <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the

10   defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law.

11   <u>See id.</u> at 51-55.

12          Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that

13   prosecutors would present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at

14   20.

15                  Now, again, this emphasizes the difference between the function
                    of the grand jury and the trial jury.  You're all about probable
16                  cause.  If you think that there's evidence out there that might
                    cause you say "well, I don't think probable cause exists," then it's
17                  incumbent upon you to hear that evidence as well.  As I told you,
                    in most instances, *the U.S. Attorneys are duty-bound to present*
18                  *evidence that cuts against what they may be asking you to do if*
                    *they're aware of that evidence.*
19

20   <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and

21   their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear

22   in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters

23   presented to you."  <u>See id.</u> at 27.  The Ninth Circuit has already concluded it is likely this final

24   comment is "unnecessary."  <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1207.

25          This particular instruction has a devastating effect on the grand jury's protective

26   powers, particularly if it is not true.  It begins by emphasizing the message that <u>Navarro-Vargas II</u>

27   somehow concluded was not conveyed by the previous instruction: "You're all about probable

28   cause."  <u>See</u> Ex. A at 20.  Thus, once again, the grand jury is reminded that they are limited to

17                                                                        08CR0726-DMS

1    probable cause determinations (a reminder that was probably unnecessary in light of the fact that

2    Judge Burns had already told the grand jurors that they likely would be excused if they rejected this

3    limitation).  The instruction goes on to tell the grand jurors that they should consider evidence that

4    undercuts probable cause, but also advises the grand jurors that the prosecutor will present it.  The

5    end result, then, is that grand jurors should consider evidence that goes against probable cause, but,

6    if none is presented by the government, they can  presume that there is none.  After all, "in most

7    instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be

8    asking you to do if they're aware of that evidence."  See id.  Moreover, during voir dire, Judge Burns

9    informed the jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's

10   something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to*

11   *do that*."  See Ex. B at 14-15 (emphasis added).  Thus, if the exculpatory evidence existed, it

12   necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors

13   "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be

14   honest, and ... they'll act in good faith in all matters presented to you."  See Ex. A at 27.

15          These instructions create a presumption that, in cases where the prosecutor does not

16   present exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case

17   in which no exculpatory evidence was presented, would proceed along these lines:

18          (1)  I have to consider evidence that undercuts probable cause.

19          (2)  The candid, honest, duty-bound prosecutor would, in good faith, have presented

20          any such evidence to me, if it existed.

21          (3)  Because no such evidence was presented to me, I may conclude that there is none.

22   Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

23   evidence presented represents the universe of all available exculpatory evidence; if there was more,

24   the duty-bound prosecutor would have presented it.

25          The instructions, therefore, discourage investigation -- if exculpatory evidence were

26   out there, the prosecutor would present it, so investigation is a waste of time -- and provide

27   additional support to every probable cause determination: i.e., this case may be weak, but I know that

28   there is nothing on the other side of the equation because it was not presented.  A grand jury so badly

1  misguided is no grand jury at all under the Fifth Amendment.[9]

2  **III.**

3  **CONCLUSION**

4      For the reasons stated, Mr. Garcia requests that this Court grant his motions.

5

6      Respectfully Submitted,

7      *sl Bridget Kennedy*

8  Dated: April 15, 2008      **BRIDGET KENNEDY**
    Federal Defenders of San Diego, Inc.
9      Attorneys for Mr. Garcia

10

11

12

13

14

15

16

17  _____

18     [9] Judge Moskowitz has recently ruled on a motion similar to that filed by Mr. Garcia. See United States v. Martinez-Covarrubias, Case No. 07CR0491-BTM, Order Denying Defendant's

19  Motion to Dismiss the Indictment, dated October 11, 2007 (attached hereto as Exhibit J). While Mr. Garcia disagrees with Judge Moskowitz's analysis, Judge Moskowitz at least recognizes that a

20  portion of the instruction is error, although he incorrectly found that it was not structural. Ex. J at

21  11. Because, under Judge Moskowitz's analysis, this Court must determine whether the error was harmless, Mr. Garcia asks that this Court order the government to produce the transcripts of the

22  grand jury proceedings that resulted in the instant indictment. The Court may order disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss

23  the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P.

24  6(e)(3)(E)(ii). The Ninth Circuit requires a "particularized need" to justify disclosure, see United States v. Walczak, 785 F.2d 852, 857 (9th Cir. 1986), but that need cannot be any different than the

25  standard set for in Rule 6(e)(3)(E)(ii): Mr. Garcia need only show that "a ground *may* exist to dismiss

26  the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added). That is why the Rule's "general suggestion [is] in favor of

27  disclosure." See Walczak, 785 F.2d at 857. Here, under Judge Moskowitz's approach to Judge Burns' erroneous instruction, it is clear that, at the very least, "a ground may exist to dismiss the

28  indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).